**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JOSHUA PRESTON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-255** |
| **DARREL VANNOY, WARDEN** | **SECTION: "T"(1)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

### I.  State Court Factual and Procedural Background

Petitioner, Joshua Preston, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On June 14, 2012, Preston was charged by a bill of indictment with second degree murder of Alfonso Silver in violation of La. Rev. Stat. § 14.30.1, felon in possession of a firearm in violation of La. Rev. Stat. § 14:95.1, and armed robbery in violation of La. Rev. Stat. § 14:64.[1] After a trial, a jury found petitioner guilty as charged.[2] The trial court

---

[1] State Rec., Vol. 1 of 8 , Bill of Indictment dated June 14, 2012.
[2] State Rec., Vol. 1 of 8, minute entry dated June 24, 2014; minute entry dated June 25, 2014; minute entry dated June 26, 2014; verdict dated June 26, 2014; State Rec., Vol. 6 of 8, trial transcript of June 25, 2014; State Rec., Vol. 7 of 8, trial transcript of May 25, 2014 (con't); trial transcript of June 26, 2014.

denied petitioner's motion for motion for new trial.[3]  On July 10, 2014, the trial court sentenced petitioner to life imprisonment as to count one, twenty years as to count two, and forty years as to count three, each sentence to be served concurrently and without the benefit of probation or suspension of sentence.[4]  In July 14, 2014, petitioner filed a supplemental motion for new trial.[5] After a hearing, the trial court denied the motion on October 30, 2014.[6]

On October 28, 2015, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's convictions and sentences.[7]  The Louisiana Supreme Court denied writs without stated reasons on November 18, 2016.[8]  Petitioner did not file for a writ of certiorari with the United States Supreme Court.

On June 20, 2017, petitioner filed a state post-conviction application asserting nine claims.[9] The trial court denied relief on October 5, 2017.[10]  On June 25, 2018, the Louisiana Fifth Circuit Court of Appeal affirmed the denial of all the claims but one, and remanded the one claim (denial of effective assistance of counsel for failure to investigate evidence relative to Brandon Watson, an alleged material witness) to the state district court for review because the state district court had failed to address it.[11]  On June 27, 2018, the state district court denied that claim.[12]  The Louisiana Supreme Court denied relief without reasons.[13]

---

[3] State Rec., Vol. 1 of 8, Motion for New Trial dated June 30, 2014; minute entry dated July 10, 2014; State Rec. Vol. 7 of 8, sentencing transcript of July 10, 2014.
[4] State Rec., Vol. 1 of 8, minute entry dated July 10, 2014; State Rec., Vol 7 of 8, sentencing transcript of July 10, 2014.
[5] State Rec., Vol. 1 of 8, Supplemental Motion for New Trial dated July 14, 2014.
[6] State Rec., Vol. 1 of 8, minute entry dated October 30, 2014; State Rec. Vol. 7 of 8, hearing transcript of October 30, 2014.
[7] State v. Preston, 178 So. 3d 207 (La. App. 5th Cir. 2015); State Rec., Vol. 7 of 8.
[8] State v. Preston, 210 So. 3d 283 (La. 2016); State Rec., Vol. 8 of 8.
[9] State Rec., Vol. 2 of 8.
[10] State Rec. Vol. 3 of 8, Order dated October 5, 2017.
[11] Preston v. Vannoy, No. 18-KH-120, 2018 WL 3720068 (La. App. 5th Cir. Jun. 25, 2018); State Rec., Vol. 3 of 8.
[12] State Rec., Vol. 3 of 8, Order dated June 27, 2018.
[13] Preston v. Vannoy, 280 So.3d 168 (La. 2019); Rec. Doc 3-5, p. 43.

On January 22, 2020, petitioner filed the instant federal application seeking habeas corpus relief in which he asserts the following claims for relief:[14]  (1) the trial court erred in denying petitioner's motion to suppress an in-person lineup because he was denied the right to an attorney; (2) the trial court erred in refusing to grant a mistrial when it refused to replace two sleeping jurors; (3) there was insufficient evidence to support the armed robbery conviction; (4) ineffective assistance of counsel in failing to pursue an alibi defense; (5) prosecutorial misconduct in that the prosecution allowed its witnesses to commit perjury; (6) ineffective assistance of counsel in failing to present crucial evidence; (7) ineffective assistance of counsel in failing to investigate and present evidence of video footage related to the armed robbery; and (8) ineffective assistance of counsel in failing to investigate evidence relative to a material witness, Brandon Watson.

On June 5, 2020, the state filed its response.  It concedes that petitioner's petition is timely and his claims are exhausted.[15]  The state argues that petitioner's eighth claim relating to the failure to present the testimony of Brandon Watson is procedurally barred because he failed to return to the Louisiana Fifth Circuit Court of Appeal after the issue was denied by the state district court, but instead proceeded directly to the Louisiana Supreme Court.  The state contends that the other claims are meritless.  Petitioner filed a traverse claiming he is actually innocent to overcome procedural default.  He also raises Martinez v. Ryan, 566 U.S. 1 (2012), and reiterates his claims.[16]

## II. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections

---

[14] Rec. Doc. 3.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  The Prison Legal Department received petitioner's original petition on January 22, 2020.  Rec. Doc. 1.
[15] Rec. Doc. 10.
[16] Rec. Doc. 21.

2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state courts' decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state courts' decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of

> facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 134 S. Ct. 1697, 1705 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the

United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion
> was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As
> amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  It preserves
> authority to issue the writ in cases where there is no possibility fairminded jurists
> could disagree that the state court's decision conflicts with this Court's precedents.
> It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard
> against *extreme malfunctions* in the state criminal justice systems, *not a substitute*
> *for ordinary error correction through appeal.  As a condition for obtaining habeas*
> *corpus from a federal court, a state prisoner must show that the state court's ruling*
> *on the claim being presented in federal court was so lacking in justification that*
> *there was an error well understood and comprehended in existing law beyond any*
> *possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White, 134 S. Ct. at

1701.

### III. Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this

case as follows:

> On the evening of July 16, 2011, Alfonso Silva was murdered on the 900
> block of Roosevelt Boulevard in Kenner, Louisiana.  Police investigating the
> murder were able to reconstruct the events leading up to the victim's death from
> surveillance videos of nearby businesses and residences.  The surveillance videos
> showed that the victim was leaving Brother's Food Mart located on Airline

Highway and walking toward his home when a thin black male wearing a white polo shirt with blue stripes, blue jeans, and a blue hat, began following him.  After following the victim for several blocks, the suspect confronted the victim at the corner of Airline Highway and Roosevelt Boulevard, shot the victim in the abdomen, and ran north on Roosevelt Boulevard. Despite medical intervention, the victim ultimately succumbed to this gunshot wound.

At the time of the shooting, Sherry Conant was talking on the phone on the front porch of her home located at 917 Taylor Street in Kenner, which is one block northwest of where the victim was shot.  Upon hearing the gunshot, Ms. Conant ended her conversation to call 9–1–1, at which point she witnessed a young black male running down the street from the direction of the gunshot.  Ms. Conant testified that she got a "good look" at the suspect and described him as a "young black male," with "short hair ... clean cut ... long face, high cheekbones," wearing a "white shirt, blue stripes, double blue stripes, blue jeans," and a "bright blue hat." Ms. Conant then called the police to report what she had witnessed and recounted the same events later that night to Detective Joseph McRae, the lead Kenner Police Detective on the investigation.  Approximately two weeks later, Detective McRae showed Ms. Conant still photographs captured from Brother's Food Mart surveillance videos depicting a suspect wearing clothes that matched Ms. Conant's description.  Ms. Conant identified the suspect in these photos as the same man she had witnessed running in front of her home on the night of the murder.

Kenner police officers also developed a composite sketch of the suspect based on Ms. Conant's description.  These still photographs and the composite sketch were later used in a Crimestoppers bulletin posted throughout the area seeking information as to the identity of the pictured suspect.  In response to this Crimestoppers bulletin, the Kenner Police Department received anonymous tips implicating defendant in the murder.  Based on these tips, Detective McRae developed a photographic lineup that included defendant's photo and returned to Ms. Conant's home on September 13, 2011, with the photo lineup, but she was unable to positively identify anyone in the lineup.  Ms. Conant later testified that she was "not very good with photographs."

Danielle Lathers, the mother of defendant's girlfriend, later told police that she had provided an anonymous tip implicating defendant.  At trial, Ms. Lathers testified that she and her daughter saw the bulletin while shopping with defendant and that they both immediately recognized defendant as the suspect in the picture based on his clothing.  Ms. Lathers also testified that defendant later told her that he had needed some money and that he had killed the victim because he had seen defendant's face.

On February 1, 2012, defendant was arrested for the armed robbery of Tiffany Hayes French in front of the New Generation Fellowship church on Roosevelt Boulevard in Kenner.  At trial, Ms. French testified that she was approaching the church around 7 p.m. when a young African American male put a silver handgun to her neck and grabbed one strap of her purse.  Ms. French testified that she "let go of [her] purse and the person ... just took off running."  Due to the late hour, the poor lighting around the church, and being "shaken" from the incident, Ms. French could not offer a clear description of the suspect's face.  Based

on the limited description provided by Ms. French, police dispatchers broadcasted a description of the suspect as being a thinly-built male between 20 and 25 years old, with a height of 5'7", wearing a black, short-sleeved t-shirt, dark jeans, and carrying a gray purse and a silver pistol.

Kenner Police Officers in the area began searching for the suspect around Roosevelt Boulevard. Officer John Cusimano testified that during the search, he heard the sound of tin-fences moving and witnessed a male jumping a fence and running away from the officers. While pursuing this suspect, two men outside of a nearby house waved to Officer Cusimano and indicated that someone was underneath the elevated house at 718 Filmore Street. As Officer Cusimano circled the house he heard "scuffling" coming from beneath the house and then saw a person fleeing from under the house wearing jeans and a gray t-shirt with red writing on it.

Minutes later, Detective Robert Wimberly, who was also searching for the armed robbery suspect, received information that the suspect was in a nearby house located at 728 Filmore Street. Detective Wimberly went to that house with other officers and received consent to search the house from a resident. The officers immediately went to the back bedroom in response to another officer's radio report that the light in that bedroom had been turned off when the officers were at the front door. In that bedroom, officers found defendant lying on the floor "kind of half under the bed like he was trying to hide," and another individual, Sammy Matthews, sitting on the bed. Defendant was wearing a t-shirt and shorts, and his arms and legs were covered in mud.

While securing defendant, the officers found Ms. French's cell phone in a dresser drawer next to the spot where defendant was found. On that same evening, officers searching the 728 Filmore Street residence discovered muddy clothing consistent with Ms. French's description of the suspect who had robbed her and consistent with the clothing worn by the subject Officer Cusimano had chased from underneath the house at 718 Filmore Street.

After arresting defendant and securing the other individuals present in the residence, officers conducted a "show-up" identification procedure in which Ms. French was shown all of the black males arrested in the residence at 728 Filmore Street and asked her if she could identify any of them as the person who had robbed her. Ms. French was unable to identify any of the persons present as the perpetrator of the armed robbery.

The day after arresting defendant, police officers discovered a silver revolver in a backyard adjacent to the residence at 728 Filmore Street in which they had discovered defendant. On the following day, after obtaining a search warrant for 728 Filmore Street, police officers returned to conduct a more thorough search of the residence and discovered Ms. French's gray purse located in a laundry room. This purse contained numerous items belonging to Ms. French, including her ID, checkbook, and credit cards.

On February 13, 2012, while defendant was in custody, the State obtained an order compelling defendant's presence in a physical lineup. On February 15, 2012, at a physical lineup, Ms. Conant positively identified defendant as the person

she had seen running from the scene of the shooting of Alfonso Silva on July 16, 2011.[17]

## IV.    Petitioner's Claims[18]

### A.  Motion to Suppress

Petitioner first claims that the trial court erred in denying his motion to suppress the physical lineup identification procedure because he asked for an attorney to be present.  He contends that he had been appointed an attorney not more than 72 hours after his arrest before the trial court ordered the lineup.  He further claims, however, that the lineup was conducted without counsel present contrary to his request.  Preston argues that he was entitled to have counsel present under the Sixth Amendment and state constitutional law, citing United States v. Wade, 388 U.S. 218 (1967), and Gilbert v. California, 388 U.S. 263 (1967), State v. Thomas, 406 So. 2d 1325 (La. 1981), and La. Code Crim P. art. 230.

In denying this claim on direct appeal, the Louisiana Fifth Circuit found:

> In his first assignment of error, defendant argues that the trial court erred in denying his Motion to Suppress a physical lineup identification, because he was denied his right to counsel under the Sixth Amendment and La. Const. Article 1, § 13, when the physical lineup was conducted without appointed counsel present on his behalf.[1]
>
> [1]At the time the lineup took place, there is no evidence that defendant had retained counsel for representation, therefore, we do not opine on defendant's right to retained counsel under these circumstances and limit our discussion to defendant's right to the presence of appointed counsel at a pre-indictment physical lineup.
>
> At the hearing on defendant's motion to suppress, Detective McRae testified that after defendant's February 1, 2012 arrest for armed robbery, he contacted Sherry Conant.  Ms. Conant agreed to view a physical lineup and attempt to identify the suspect she had seen fleeing the scene of the July 16, 2011 murder of Alfonso Silva.  Detective McRae then authored a motion to compel defendant's presence in a physical lineup, which was granted on February 13, 2012.  On that same day, Detective McRae met with defendant, who was still incarcerated, and reviewed the motion to compel with defendant.  During that meeting with defendant, Detective McRae testified that he explained to defendant that defendant had a right to have his attorney present and to give the motion to compel to his

---

[17] State v. Preston,178 So. 3d 207, 211-213 (La. App. 5th Cir. 2015); State Rec., Vol. 7 of 8.
[18] For ease of analysis, this Report and Recommendation addresses petitioner's ineffective assistance of counsel claims together rather than in the order they were listed in his federal petition.

attorney. Detective McRae notified defendant that the physical lineup would take place two days later. Detective McRae testified that at the time of this meeting, defendant voiced no objection to the physical lineup.

On February 15, 2012, Detective McRae returned to defendant's cell to review an "advice of lineup rights" form with him in anticipation of the physical lineup scheduled for that day. On that form, defendant indicated for the first time that he did not agree to stand in a lineup without an attorney present.[2] Consequently, Detective McRae contacted a member of the District Attorney's Office to arrange the presence of counsel for defendant. The District Attorney later notified Detective McRae that the Indigent Defender Board had refused to represent defendant because they were not assigned to his case. Despite defendant's objection, the physical lineup went forward. Detective McRae testified that prior to the lineup defendant was present in the same room with all of the other participants in the lineup and told officers in the room that he was satisfied with those participants.[3] Officers conducting the lineup also allowed defendant to select his own position within the lineup.

[2]The pertinent portion of the advice of lineup rights form states, "You have the right to have an attorney representing you present at this lineup to assure that your rights are protected. If you are financially unable to provide an attorney of your own, one will be provided to represent you at no cost to you if you want one at the lineup. If your own attorney is unavailable for the lineup, you can request that the court appoint you with a substitute attorney for the purpose of this lineup."

[3]At trial, the State introduced photographs of the lineup participants. These photographs show that the other lineup participants possessed similar physical characteristics as defendant.

After Ms. Conant entered the observation room the lineup participants filed into a room on the opposite side of a one-way glass window. Ms. Conant testified that she knew immediately that defendant was the same person she had seen fleeing from the scene of the July, 16, 2011 murder, but that it was very important for her to be "absolutely positive" she was correct. Accordingly, Ms. Conant had defendant step forward to confirm her initial identification. Ms. Conant testified that upon closer inspection of defendant she identified him as the suspect, because of his height, his facial appearance, and because he exhibited the same "nervous tick" of "sucking his bottom lip" as that of the suspect who had passed her house on July 16, 2011. Ms. Conant also identified defendant as the suspect in the courtroom during her testimony.

Defendant argues that the State acted in bad faith by deliberately delaying filing formal charges against defendant, thereby preventing attachment of defendant's right to appointed counsel. Defendant further argues that the State acted in bad faith by conducting the lineup without providing counsel for defendant after he noted his objection on the advice of rights form.

It is well-settled that a person's right to counsel under both the federal and state constitutions attaches only after the initiation of adversarial judicial proceedings against him. See, e.g., Davis v. United States, 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); State v. Carter, 94–2859 (La.11/27/95), 664 So.2d 367, 371. While the commencement of "adversary judicial criminal proceedings" is generally marked by the filing of a formal charge, i.e., a bill of indictment or information, both the United States and Louisiana Supreme Courts have employed a functional test to make this determination. See, e.g., McNeil v. Wisconsin, 501 U.S. 171, 175–176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); State

v. Montejo, 06–1807 (La.5/11/10), 40 So.3d 952, 972. Thus, under both state and federal law, the point at which the right to counsel attaches is where the proceedings shift from investigation to accusation. Absent filing a bill of information or indictment, that point is at the defendant's initial court appearance or first judicial hearing. State v. Hattaway, 91–894 (La.7/2/93), 621 So.2d 796, 808, overruled in part on other grounds by Carter, supra.

Distinct from the constitutional right to counsel, La.C.Cr.P. art. 230 gives the accused a statutory right to procure and confer with counsel from the moment of arrest. State v. Thomas, 406 So.2d 1325, 1328 (La. 1981). Nevertheless, violation of La. C.Cr.P. art. 230 does not require exclusion of evidence absent the showing of a bad faith effort to circumvent the defendant's statutory right to counsel. Thomas, 406 So.2d at 1328–29; State v. Graffia, 06–756 (La. App. 5 Cir. 1/30/07), 951 So.2d 1186, 1191.

In the instant case defendant was denied the presence of appointed counsel at a lineup that occurred after his arrest but prior to an initial court appearance or the return of a true bill of indictment against defendant. Accordingly, the defendant's constitutional right to counsel had not yet attached at the time of the lineup, thus he was not entitled to the presence of appointed counsel at the lineup in question.

We further find no indication in the record that the State engaged in a bad faith effort to circumvent defendant's right to counsel at the lineup. Contrary to defendant's argument, the State had no duty to obtain an indictment against defendant at the earliest possible moment. Neither the speedy trial rights guaranteed by the Constitution, nor the time delays for instituting prosecution under La. C.Cr.P. art. 572 required the State to file a bill of information or seek an indictment prior to the lineup, which occurred two weeks after defendant's arrest. To the contrary, prudence dictates that the State conduct a thorough investigation before instituting prosecution of such a serious offense, and the lineup identification was an integral part of the State's investigation.

The advice of rights lineup form provided to defendant does not change our conclusion that the State conducted this lineup in good faith. The pre-printed, uniform advice of rights form given to defendant did not accelerate the point at which his right to appointed counsel attaches, thus defendant's written objection to participating in the lineup without the presence of appointed counsel did not give him a right to the presence of appointed counsel which he would not have had otherwise.

Moreover, the record demonstrates that the State exceeded its statutory and constitutional obligations in attempting to accommodate the defendant's request for counsel during the lineup. After defendant declined to voluntarily participate in the lineup with the presence of counsel, Detective McRae attempted to satisfy defendant's request. When the Indigent Defender Board refused the State's request, the officers conducting the lineup took efforts to ensure the fairness and accuracy of the procedure by allowing defendant to accept or reject the participants in the lineup and to select his own position within the lineup. Thus, nothing in the record suggests a bad faith effort on the part of the State to circumvent defendant's right

to counsel, nor is there any indication that counsel's presence would have changed the outcome.

In State v. Graffia, under virtually identical facts, this Court held that the State acted in good faith in conducting a lineup where the State attempted to comply with a pre-indictment defendant's request for counsel at a lineup and, after the Indigent Defender Board refused to attend the lineup, allowed the defendant to select the lineup participants and to select his position among them.  Graffia, 951 So.2d at 1191.

For the foregoing reasons, we find that the trial court did not err in denying the motion to suppress the physical lineup identification.[19]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[20]  See Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

Preston's claim that the denial of counsel at his lineup violated Louisiana law is not cognizable in a Section 2254 petition.  See Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law); Stewart v. Cain, 189 F.3d 468, 1999 WL 511903, at *1 (5th Cir. Jul. 1, 1999) (per curiam) (Table, Text in Westlaw) (state law claim that lack of counsel at lineup not cognizable under Section 2254); Hougtion v. Cain, Case No. 08–5063, 2011 WL 4381592, at *17 (E.D. La. Jul. 26, 2011) (finding the denial of counsel at a lineup under Louisiana law was not cognizable), adopted, 2011 WL 4381561 (E.D. La. Sept. 20, 2011).  In addition, he is not entitled to relief under the Sixth and Fourteenth Amendments for the following reasons.

A person's Sixth Amendment and Fourteenth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against him."  Kirby v.

---

[19] Preston, 178 So. 3d at 214-17; State Rec., Vol. 7 of 8..
[20] Preston, 210 So. 3d at 283; State Rec., Vol. 8 of 8.

Illinois, 406 U.S. 682, 688 (1972); see also United States v. Gouveia, 467 U.S. 180, 190 (1984). Adversary judicial proceedings are initiated by way of formal charge, preliminary hearing, indictment, information, or arraignment.  See Kirby, 406 U.S. at 688-89; Brewer v. Williams, 430 U.S. 387, 398 (1977).  The Supreme Court has held that a pretrial lineup conducted *after* a suspect has been indicted is a critical stage in a criminal prosecution at which the Sixth Amendment entitles the accused to the presence of counsel.  United States v. Wade, 388 U.S. 218, 236-37 (1967) (emphasis added).  A suspect's constitutional right to the assistance of counsel at a police lineup under Wade attaches only after there has been a formal charge, preliminary hearing, indictment, or information with respect to the particular offense for which the lineup is being conducted.  See McNeil v. Wisconsin, 501 U.S. 171, 175 (1991).

The Supreme Court in Kirby declined to extend the right to counsel to pre-indictment lineups, and explained that a defendant in those circumstances is sufficiently protected by the Due Process Clause of the Fifth and Fourteenth Amendments, which forbids admission of a pre-trial lineup identification that is unnecessarily suggestive and conducive to irreparable mistaken identification.  Kirby, 406 U.S. at 690-91; accord Johnson v. Jaquez, No. C 10-416SI(pr), 2014 WL 2192381, at *11 (N.D. Cal. May 23, 2014) ("Counsel is not required at pre-indictment lineups, however, because the right to counsel does not attach until adversary judicial proceedings have been initiated against a defendant.")

In this case, petitioner was arrested on February 1, 2012.  The physical lineup occurred on February 15, 2012.[21]  Contrary to his claim, the preliminary hearing occurred after the lineup, on March 27, 2012, at which time he was represented by counsel.[22]  There is simply no right to counsel at a pre-indictment lineup clearly established by Supreme Court precedent.  Houghton, 2011 WL

[21] State Rec., Vol. 6 of 8, preliminary hearing transcript of March 27, 2012, pp. 43, 60-61
[22] Id., pp. 1, 4-5, 11-19.

4381592, at *18 (citing <u>Wallace v. Cain</u>, No. 06–11271, 2009 WL 3367052 (E.D.La. Oct. 15, 2009).

For the foregoing reason, the state court's denial of relief on this claim is not contrary to or an unreasonable application of, Supreme Court precedent.  Petitioner is not entitled to relief on this claim.

### B.    <u>Denial of Mistrial</u>

Preston next claims that the trial court erred in denying his request for a mistrial when it refused to replace two jurors who were sleeping during trial.  He contends that the trial court should have at least inquired of the two jurors to determine whether they had fallen asleep during the trial.

In denying this issue on direct review, the Louisiana Fifth Circuit found as follows:

> In his second assignment of error, defendant argues that the trial court erred in refusing to order a mistrial after denying defendant's motion to replace two allegedly sleeping jurors with alternate jurors.
> La. C.Cr.P. art. 775 provides that, "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial[.]"  A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to the defendant that deprives him of a reasonable expectation of a fair trial.  Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion.  <u>State v. Williams</u>, 12–687 (La. App. 5 Cir. 05/16/13), 119 So.3d 228, 235.
> La. C. Cr. P. art. 789A provides the standard for substituting a juror with an alternate juror: "Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties."  In <u>State v. Cass</u>, the Louisiana Supreme Court held that a trial court's summary removal of a juror who was allegedly sleeping during a portion of the trial testimony was reversible error.  <u>State v. Cass</u>, 356 So.2d 396, 398 (La. 1977).  The <u>Cass</u> court reasoned that, under art. 789, even if a juror had briefly "doze[d] off, such is not per se proof of inability to perform, or any character of disqualification."  <u>Id.</u>  In <u>State v. Sterling</u>, this Court held that a trial court did not err in refusing to replace a sleeping juror where the trial judge observed a juror "nodding off" several times during trial but did not observe the juror sleeping during a "substantial part of the trial," nor did the trial judge see the juror asleep for any extended period of time, and the defendant did not request a hearing to determine whether the juror was actually asleep or unable to perform his function.  <u>State v. Sterling</u>, 13–287 (La.

14

App. 5 Cir. 12/12/13), 131 So.3d 295, 306.  In <u>State v. King</u>, this Court held that a trial court did not err in refusing to replace a juror whose eyes were closed during trial, because the trial judge did not believe the juror was sleeping and there was no indication that the juror was sleeping through a substantial portion of the trial.  <u>State v. King</u>, 11–767 (La. App. 5 Cir. 2/28/12), 88 So.3d 1147, 1156.

In the instant case, defense counsel requested a bench conference during the testimony of Detective McRae, wherein she informed the trial judge that defendant had reported that two of the jurors were sleeping during testimony.  In response, the trial judge asked the jurors to stand up and stretch in an effort to reenergize themselves.  The trial court later allowed defense counsel the opportunity to review security camera footage to substantiate defendant's report.  At a hearing on the motion the next day, defense counsel stated that she was unable to determine from the camera footage whether the jurors were sleeping, but she called an investigator for the public defender's office to testify as to his observations.  The investigator testified that he witnessed one juror "fighting [sleep]" but admitted that he "never saw her sleeping."  The trial judge also stated that he observed "a nod or two here and there," but that this was a common occurrence in any jury trial, and that the testimony regarding jurors sleeping put forth by defendant was "underwhelming."  Accordingly, the trial judge denied the motion.  Defense counsel then moved for a mistrial based on the trial judge's ruling, which the trial judge denied for the same reasons.

We find that the trial court did not abuse its discretion in denying defendant's motion to substitute the jurors and consequently that the trial court did not abuse its discretion in denying defendant's motion for mistrial.  There is no evidence in the record indicating that any jurors were actually asleep.  Defendant was the only person who claimed to witness [sic] any jurors actually asleep, and he did not testify to his observations at the hearing on the motion.  No other potential witnesses in the courtroom could positively state that any jurors were asleep during trial.  Moreover, we find that the trial judge gave defendant ample opportunity to establish grounds for substituting the jurors and that the trial judge acted within his discretion in determining that defendant had failed to sufficiently support his claim.

Accordingly, we find no error in the trial court's denial of defendant's motion for mistrial.[23]

As an initial matter, the Court notes that petitioner cites only Louisiana law in support of his claim.  Petitioner's arguments that the trial court erred in failing to grant a mistrial under state law do not involve consideration of any questions of federal or constitutional law, and review of such claims is not proper on habeas review.  <u>See</u> <u>Lavernia v. Lynaugh</u>, 845 F.2d 493, 496 (5th Cir. 1988) (the failure to grant a mistrial is a matter of state law and not one of a constitutional

---

[23] <u>Preston</u>, 178 So. 3d at 217-18; State Rec, Vol. 7 of 8.

dimension); <u>Haygood v. Quarterman</u>, 239 F. App'x 39, 42 (5th Cir. Jun.14, 2007) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right) (citing <u>Dickerson v. Guste</u>, 932 F.2d 1142, 1145 (5th Cir. 1991) ).  Thus, even the misapplication of state law in denying the motion for mistrial would not entitle petitioner to relief.  <u>Thomas v. Ieyoub</u>, 26 F.3d 1119, No. 93-3757, 1994 WL 286198, at *2 (5th Cir. June 22, 1994) (per curiam) (Table, Text in Westlaw))  ("[E]rrors of state law, such as a denial of a mistrial, must rise to a constitutional dimension in order to merit habeas relief."); <u>Smith v. Whitley</u>, 18 F.3d 937, 93-03208, 1994 WL 83777, at *1 (5th Cir. Mar. 3, 1994) (Table, Text in Westlaw) ("Even if the court's refusal to declare a mistrial was a violation of Louisiana law, we, as a federal habeas court, are without authority to correct a simple misapplication of state law; we may intervene only to correct errors of constitutional significance.").  Any alleged impropriety based on state law does not warrant federal habeas review or relief.

A state court's denial of a motion for mistrial will trigger federal habeas corpus relief only if it was " 'error ... so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause.' "  <u>Hernandez v. Dretke</u>, 125 F. App'x 528, 529 (5th Cir. 2005) (quoting <u>Bridge v. Lynaugh</u>, 838 F.2d 770, 772 (5th Cir. 1988) ).  In order to receive federal habeas relief, petitioner must show that "the trial court's error had a 'substantial and injurious effect or influence in determining the jury's verdict.' "  <u>Hernandez</u>, 125 F. App'x at 529 (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 629, 623 (1993) ).  Petitioner must show that "there is more than a mere reasonable possibility that [the ruling] contributed to the verdict.  It must have had a substantial effect or influence in determining the verdict."  <u>Woods v. Johnson</u>, 75 F.3d 1017, 1026 (5th Cir. 1996).

The question of fundamental fairness at trial under the Due Process Clause presents a mixed question of law and fact.  <u>Wilkerson v. Cain</u>, 233 F.3d 886, 890 (5th Cir. 2000); <u>see</u>

Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997) (whether evidence is admitted or excluded contrary to the Due Process Clause also is a mixed question of law and fact). The court must determine whether the denial of relief by the state courts was contrary to or an unreasonable application of federal law. In doing so, factual determinations made by the state court are presumed correct and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In this case, petitioner fails to present clear and convincing evidence that any juror was sleeping so as to overcome the state court's findings. During the testimony of Detective McRae, at a bench conference, defense counsel claimed that petitioner informed her that two jurors appeared to be asleep.[24] These two jurors were identified as a Mr. Nguyen and a female sitting in front of him.[25] Defense counsel claimed that both had closed their eyes on several occasions and appeared to be nodding off.[26] The trial court had everyone stand and stretch and asked if anyone needed a break, however, no juror requested one.[27] Defense counsel requested a break to view the security cameras to determine whether any jurors had fallen asleep.[28] The trial court continued with McRae's testimony, but allowed defense counsel to view the security footage the following morning.[29]

After viewing the security footage, defense counsel admitted that she could not see the jurors' faces.[30] Defense counsel advised of her intent to present testimony of petitioner and an IDB investigator to proffer a basis for a mistrial.[31] Defense counsel moved for a mistrial.[32]

---

[24] State Rec., Vol. 7 of 8, trial transcript (con't) of May 25, 2014, p. 146.
[25] Id., pp. 146, 174-75.
[26] Id.
[27] Id.
[28] Id.
[29] Id., pp. 148, 175-78
[30] State Rec., Vol. 7 of 8, trial transcript of May 26, 2014, p. 5.
[31] Id.
[32] Id., p. 55.

Defense counsel stated that she observed juror Shannon Barberot "fighting her sleep" and being inattentive while McRae testified about the videos and photographs.[33]  She stated that she also noticed juror Nguyen nodding off, "but not for a substantial period of time."[34]

The prosecutor stated that he did not look at the jury until the issue had been raised and, after that point, only noticed Barberot, who was not sleeping, but positioned her head down at times when listening to testimony.[35]  The trial court noted that, after the issue was raised, it paid closer attention to the jury and did not observe any jurors napping.[36]

Defense counsel presented the testimony of James Schanbien, an investigator, who testified that he noticed a male juror's head go down for a few seconds and then lift back up and he opened his eyes.[37]  He admitted that it lasted maybe a second or two.[38]  He also testified that he observed a female juror constantly rubbing her eyes and blinkingly quickly, but never saw her sleeping.[39]

Defense counsel requested that the jurors be excused and replaced with alternate jurors.[40] The trial court stated that it noticed a nod or two here and there, but that was not uncommon, and that the court itself sometimes closed its eyes to concentrate.[41]  The court found the testimony "underwhelming" and denied both the request to replaces the jurors and the motion for mistrial.[42]

Petitioner has not shown that the trial court erred in failing to grant the motion for a mistrial. Nor has he shown any prejudice as a result of a juror possibly nodding off for a few seconds during a two day trial.  Therefore, petitioner has not shown that the state court's decision rejecting his

---

[33] Id., p. 56.
[34] Id.
[35] Id., p. 57.
[36] Id.
[37] Id., p. 58.
[38] Id., p. 59.
[39] Id., p. 58.
[40] Id., p. 59.
[41] Id., pp. 59-60.
[42] Id., p. 60.

claim was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  Relief is not warranted.

### C.    Sufficiency of the Evidence

Petitioner's third claim is that there was insufficient evidence to prove that he was in fact guilty of the crime of armed robbery.  He contends that the state failed to prove his identity as the perpetrator of the crime beyond a reasonable doubt and did not eliminate every hypothesis of innocence.

On direct appeal, the Louisiana Fifth Circuit Court of Appeal denied his claim relating to the sufficiency of the evidence holding:

> Though defendant alleges the insufficiency of the evidence to support his armed robbery conviction in his third assignment of error, when the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence before addressing the allegations of trial error.  State v. Hearold, 603 So.2d 731, 734 (La.1992).  Accordingly, we first address the sufficiency of the evidence before addressing defendant's remaining assignments of error.
>
> Defendant argues that the evidence was insufficient to support a jury's finding that he was the person who committed the armed robbery.  Defendant does not argue that the State failed to prove all of the essential elements of armed robbery under La. R.S. 14:64; rather, defendant contends that the circumstantial evidence of his identity as the perpetrator of the armed robbery failed to negate all reasonable hypotheses of innocence.  Defendant's argument is based on the absence of any witness capable of identifying him as the perpetrator of the armed robbery against Tiffany Hayes French.
>
> Defendant further asserts that the testimony of Danielle Lathers casts doubt on his identity as the armed robber.  At trial, Danielle Lathers testified that an individual named Joshua Jones told her that he robbed an "old lady" of either her social security or income tax check at gunpoint in front of a church.  Ms. Lathers testified that Joshua Jones told her that he had fled to the residence at 728 Filmore Street after the robbery and that he was present in the house when police arrested defendant within that residence.  On cross-examination, Ms. Lathers admitted that she did not have personal knowledge of the truth of the alleged confession by Joshua Jones.  Beyond Ms. Lathers' testimony, defendant offered no additional evidence as to the identity of Joshua Jones or the truth of his alleged confession.
>
> In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both,

viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, (1979); State v. Neal, 00–674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).  Evidence may be direct or circumstantial.  Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience.  State v. Williams, 05–59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833.  All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.  State v. Wooten, 99–181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99–2057 (La.1/14/00), 753 So.2d 208.

An appellate court's primary function is not to re-determine the defendant's guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses.  Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury's conclusion.  State v. Banford, 94–883 (La. App. 5 Cir. 3/15/95), 653 So.2d 671, 677.  The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal.  State v. Rowan, 97–21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

In addition to proving the statutory elements of the charged offense at trial, the State is required to prove defendant's identity as the perpetrator.  State v. Draughn, 05–1825 (La.1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Ingram, 04–551 (La. App. 5 Cir. 10/26/04), 888 So.2d 923, 926.  Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.  Draughn, 950 So.2d at 593.

At defendant's trial, the State presented the testimony of Ms. French who stated that a young black male took her purse from her outside of her church while armed with a gun.  Police officers then pursued a fleeing suspect, later identified as defendant, in the vicinity of the church shortly after the robbery, and tracked him to the house at 728 Filmore Street.  Inside 728 Filmore Street, the officers discovered defendant attempting to hide from police under a bed with his arms and legs covered in mud, consistent with the fleeing suspect who had hidden beneath the raised home.  The police found Ms. French's cell phone in a dresser drawer located next to the area where defendant was attempting to hide.  Upon further investigation the police found the other items stolen from Ms. French's purse in the same house where defendant was apprehended, and a silver pistol, consistent with Ms. French's testimony, in the area where the police chased defendant before finding him inside the house at 728 Filmore Street.

While Ms. Lathers' testimony may have suggested an alternative suspect, Ms. Lathers also testified that she had no personal knowledge as to the truth of this confession, nor did defendant put forth any evidence tending to prove the truth of the alleged confession.  Moreover, there is no evidence in the record that a person named Joshua Jones was present at the 728 Filmore Street house on the evening of

the armed robbery.  Even accepting the truth of Ms. Lathers' testimony and the truth of the alleged confession by Joshua Jones, arguendo, the circumstances of that alleged robbery do not comport with the facts of the instant case.  The victim in the instant case, Ms. French, was not elderly, she did not report being robbed of any social security or income tax check, nor were any social security or income tax checks discovered among the stolen items recovered in 728 Filmore Street.

Although Ms. French could not identify defendant as the person who committed the crime against her, we find that the State presented sufficient evidence to link defendant to the crimes charged.  Accordingly, we conclude that the evidence of defendant's identity as the perpetrator of the armed robbery sufficiently negated any possibility of misidentification.  Therefore, this assignment is without merit.[43]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[44]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state courts' decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, petitioner has not made such a showing.

As the Louisiana Fifth Circuit recognized, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or

---

[43] Preston, 178 So. 3d 213-14; State Rec., Vol. 7 of 8.
[44] Preston, 210 So. 3d at 283; State Rec., Vol. 8  of 8.

acquit.' " Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added). Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). Moreover, as the United States Fifth Circuit Court of Appeals has observed: "[A] state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence. The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law." Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted). Further, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Additionally, it must be remembered, contrary to petitioner's argument, that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at

*14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman v. Johnson, 566 U.S. 650, 655 (2012) ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Petitioner was charged with and convicted of armed robbery.  Armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."  La. Rev. Stat. § 14:64(A); State v. Thomas, 13 So. 3d 603, 606 (La. App. 5th Cir. 2009). To convict petitioner of armed robbery, the State was required to prove beyond a reasonable doubt all elements of the statute.  State v. Joseph, 71 So. 3d 549, 553-54 (La. App. 4th Cir. 2011).

It is not necessary to produce a weapon to support an armed robbery conviction "where the state's witnesses can establish, through their observations at the crime scene, all the elements of the charge beyond a reasonable doubt, including the existence and use of a dangerous weapon." State v. Cotton, 646 So.2d 1144, 1146 (La. App. 5th Cir. 1994) (citation omitted); accord State v. Brown, 591 So.2d 791, 794 (La. App. 5th Cir. 1991).  It is also unnecessary to produce the stolen items to support an armed robbery conviction.  State v. Glover, 754 So.2d 1044, 1048 (La. App. 1st Cir. 1999); see State v. Wickem, 759 So.2d at 961, 968 (La. App. 5th Cir. 2000) ("It is settled that the production of a weapon or other physical evidence is not required as long as the state can establish all of the elements of armed robbery beyond a reasonable doubt through the testimony of its witnesses").

Petitioner contests the sufficiency of the evidence regarding his identification as the perpetrator of the armed robbery. He contends that no witness could actually identify him as the perpetrator or link him to the robbery. Because of Ms. Lathers' testimony that a "Joshua Jones" confessed to her, he points to another person, "Joshua Jones," as the possible perpetrator.

Under Louisiana law, in addition to proving the statutory elements of the charged offense at trial, the State is required to prove a defendant's identity as a perpetrator. State v. Draughn, 950 So. 2d 583, 593 (La.), cert. denied, 552 U.S. 1012 (2007); State v. Thomas, 192 So. 3d 291, 303 (La. App. 5th Cir. 2016); State v. Ingram, 888 So. 2d 923, 926 (La. App. 5th Cir. 2004). Where the key issue is identification, the State is required to negate any reasonable probability of misidentification. Id. However, a positive identification by only one witness is sufficient to support a conviction. State v. Williams, 3 So. 3d 526, 529 (La. App. 5th Cir. 2008). A positive identification by a victim, as well as the victim's testimony alone, also is sufficient identification evidence regarding the crime committed against that victim. Holderfield v. Jones, 903 F. Supp. 1011, 1017 (E.D. La. 1995) (citing State v. Turner, 591 So. 2d 391 (La. App. 2d Cir. 1991)). Discrepancies in witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and an appellate court cannot reassess a credibility determination. State v. Thomas, 13 So. 3d 603, 607 (La. App. 5th Cir. 2008).

Tiffany Hays French testified that on the evening of February 1, 2012, she was walking to church when she felt someone put someone on her neck.[45] She turned and saw a silver gun.[46] The perpetrator grabbed her purse and ran way.[47] She immediately went into the church, told an usher, and the police were called.[48] French admitted she did not get a good look at the perpetrator and

---

[45] State Rec., Vol. 7 of 8, trial transcript of June 26, 2014, p. 24.
[46] Id., p. 24.
[47] Id., pp. 24-25.
[48] Id., p. 25.

could only recall that he was African American and taller than her.[49]  She recalled the perpetrator was wearing a black hat, a gray shirt, jeans, and clean white shoes.[50]  At trial, French was shown pictures of clothing and testified that she could not say with certainty that they were the clothing worn by the perpetrator, but testified the clothing was consistent with what she saw.[51]  French recalled the police interviewed her and transported her to a location where there were five young men present, but she was not able to identify anyone as none of them were wearing the clothing she described.[52]  French testified that the police found her cell phone and returned it to her, however, it had mud on it.[53]  The police later recovered her purse.[54]

Officer John Cusimano testified that he responded to the area of the robbery and was searching a wooded area, which was where they had seen the suspect run, when he saw a suspect jump over a fence.[55]  As he chased the subject, he saw two men who indicated that the subject was under a house at 718 Filmore.[56]  As he checked the sides of the house, Cusimano could hear scuffling underneath and he saw a subject run from underneath the house.[57]  The suspect he saw was wearing a gray shirt with red lettering and jeans.[58]  At trial, Cusimano identified clothing that was consistent with the individual he saw fleeing from underneath the house.[59]

Detective Robert Wimberly, Jr., testified that he proceeded to 728 Filmore Street after receiving information that the robbery suspect went into the home.[60]  A female consented to the

---

[49] Id., p. 26.
[50] Id., pp. 28-29.
[51] Id., pp. 29-30, 33.
[52] Id., pp. 28, 31, 3337-38.
[53] Id., pp. 30-33.
[54] Id., pp. 33-34.
[55] Id., pp 42-43.
[56] Id., pp. 43-44.
[57] Id., p. 44.
[58] Id., pp. 49-50.
[59] Id., pp. 48-49.
[60] Id., p. 62.

search of the home. Because he and Officer Cusimano had received a radio transmission that a light went off in the rear of the house when they were at the front door, upon entering the residence they when directly to the back bedroom.[61] Sammy Matthews was sitting on the bed.[62] Wimberly observed petitioner on the floor, half under the bed, trying to hide.[63] Petitioner was wearing a t-shirt and shorts and had mud on his arms and his legs.[64] Wimberly located French's cell phone in a dresser drawer in the same room.[65] No one named Joshua Jones was in the house when they found petitioner, Joshua Preston.[66]

Detective Adam Schouest was the lead detective investigating the armed robbery on February 1, 2012.[67] While he interviewed French, a chase of the subject by other Kenner police officers ensued.[68] After being advised by others that a suspect entered 728 Filmore, Schouest left French and met with Samantha Smith, a resident at that address.[69] They located several people in the house, but Officer Cusimano identified petitioner as the subject who ran from him.[70] With Smith's consent, they searched the house and located clothing in one of the bedrooms, and the petitioner and the victim's cell phone were located in a second bedroom.[71] Schouest located mud on the floor, a muddy sock, and muddy clothing, including a pair of blue jeans, and a grey shirt with red writing in the middle bedroom.[72] The clothing was the same clothing described by Cusimano that the subject was wearing.[73] They located a shoe stuck in the mud in the yard.[74] A

---

[61] Id., p. 63.
[62] Id., p. 63.
[63] Id., pp. 63-64.
[64] Id., p. 63.
[65] Id., pp. 64-65.
[66] Id., pp. 73, 84.
[67] Id., p. 67.
[68] Id., p. 68.
[69] Id., p. 68.
[70] Id., p. 69.
[71] Id., pp. 69-71, 73.
[72] Id., pp. 71-72.
[73] Id., p. 71.
[74] Id., p. 71.

second shoe was also found in the yard.[75]  Schouest brought French to the scene and showed her petitioner, who was in a police car by himself, but she said that she could not identify him as the person who robbed her.[76]

The following morning they conducted an area search of the rear yards with a K9 from ATF.[77]  After the dog alerted to the presence of explosives or gun powder, they obtained consent from the owners to further search the yards.[78]  They located a silver revolver under a piece of tin in the rear yard between the houses located at 728 and 734 Filmore.[79]  On February 3, 2012, pursuant to a search warrant, they located the victim's purse in a laundry basket under clothing in the laundry room at 728 Filmore.[80]  Schouest showed Smith a photographic lineup and she identified petitioner as the person they found in her home on the evening of February 1, 2012.[81]  During an interview, Smith told him she saw petitioner taking off muddy clothing in her house.[82]  Contrary to Lathers' testimony that a "Joshua Jones" confessed to a similar-sounding crime of robbery of either a social security check of an "old lady" in front of a church, Schouest testified that French was not an elderly woman and that the police were unable to verify that the robbery of an elderly woman's social security check occurred in the area.[83]

Samantha Smith testified that on February 1, 2012, she lived with her grandmother, Henry Chairs, Twan Chairs and "Louis" at a house on Filmore Street.[84]  On that night, other people were

---

[75] Id., p. 72.
[76] Id., p. 88.
[77] Id., p. 73.
[78] Id., p. 74.
[79] Id., pp. 74, 79-80.
[80] Id., p. 80.
[81] Id., pp. 81-82.
[82] Id., p. 93.
[83] Id., p. 85; State Rec., Vol. 6 of 8, trial transcript of June 25, 2012, pp. 90, 92, 98..
[84] State Rec., Vol. 6 of 8, trial transcript of June 25, 2014, p. 102-03.

in the house.[85]  After she had bathed and exited the bathroom, the police knocked on her door.[86] When she exited the bathroom, she spoke with "Anthony" and then saw Joshua Preston, who was wearing boxers.[87]  Joshua Preston was in the house when the police arrived, but was not in the house when she went into the bathroom.[88]  She asked petitioner what he had done.[89]  She let the police search the house and they arrested petitioner.[90]  She could not explain how the victim's cell phone got into a dresser drawer nor how the victim's purse got into her house.[91]  Smith recalled giving a statement to police but, even after reviewing her statement, claimed she did not recall telling the police petitioner had mud on him.[92]  She admitted that she identified petitioner from a set of photographs.[93]  She also identified him in court.[94]  She admitted that the police found the purse two days later when they searched the house pursuant to a warrant.[95]

In February 2012, Detective McRae, who had been involved in the murder investigation of Silva, learned of the armed robbery and obtained search warrants for petitioner's residence at 805 South Cumberland Street and 728 Filmore Street, Samantha Smith's home.[96]  A search of the Cumberland Street residence revealed a banana clip for a gun, several guns, ammunition and an envelope with petitioner's name on it.[97]  A search of the Filmore house revealed a bag of petitioner's clothes and French's purse with all the contents intact.[98]

---

[85] Id., p. 103.
[86] Id., pp. 103-04.
[87] Id., pp. 105, 116.
[88] Id., p. 104.
[89] Id., p. 116.
[90] Id., p. 110.
[91] Id., p. 110.
[92] Id., p. 106-108.
[93] Id., pp. 110-112.
[94] Id., p. 110.
[95] Id., p. 114
[96] State Rec., Vol. 7 of 8 Trial Transcript (con't) of June 25, 2014, pp. 153-54.
[97] Id., p. 154.
[98] Id., pp. 155-59.

Danielle Lathers testified that "Joshua Jones" told her that he had committed a robbery of an "old lady" and had taken her social security check.[99]  "Jones" told her he robbed the woman at a church.[100]  He told her he put a 9 mm to the back of her head and demanded her purse and her money.[101]  "Jones" told her he was followed by police and ran to Filmore Street to Henry Chair's house and was present when petitioner was arrested.[102]  Lathers admitted that she did not know whether "Jones" had told her the truth about the robbery and had no personal knowledge of whether he was present at the house when petitioner was arrested.[103]

To the extent that petitioner is challenging the credibility of the state's witnesses, it must be remembered that credibility determinations are the province of the trier of fact.  Therefore, a federal habeas court generally will not grant relief on a sufficiency claim grounded on such issues of credibility.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007) ("[T]he crucial issue was which of [the] witnesses was lying.... The judge, as the trier of fact, was obviously the one in the best position to make that call, and it is a matter appropriately left to him.").

In summary, for the reasons explained by the Louisiana Fifth Circuit Court of Appeal, when the evidence in this case is viewed in any light, much less *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*.  Therefore, petitioner

---

[99] State Rec., Vol. 6 of 8, trial transcript of June 25, 2012, pp. 90, 92, 98.
[100] Id., pp. 92-93.
[101] Id., pp. 98-99.
[102] Id., pp. 93-95, 99.
[103] Id., p. 99.

cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under these doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

**D.      Prosecutorial Misconduct in Allowing Witnesses to Commit Perjury**

Petitioner claims that the prosecution allowed its witnesses to commit perjury. He alleges that Danielle Lathers lied when she testified that petitioner admitted to her that he committed the murder. He claims she also lied when she testified that she was not present during the interview of her son, and about the location of the Crimestoppers poster. He also claims that she lied about receiving money in exchange for identifying him. He points to two subsequent cases where Danielle Lathers testified as a witness and was found to be unreliable. He further contends that Detective McRae falsely testified.

Petitioner raised this issue in his application for post-conviction relief. The state district court denied it as follows:

> The petitioner contends that the state allowed false testimony from witnesses that the petitioner admitted shooting the victim. He specifically accuses the mother of his girlfriend, Danielle Lathers, and Detective McRae of committing perjury.
> The petitioner contends Ms. Lathers is shown to be an untruthful witness in two subsequent and unrelated cases. The court does not find that these cases prove unreliability by this witness.
> The petitioner's next argument is that Ms. Lathers lied about the reward money: "To state that 'it's not about the money,' verifies that she did receive the reward money, whereas, she testified that she received 'nothing in return for her testimony.'" The petitioner takes the testimony out of context. The witness' testimony that someone with knowledge should come forward reflects good citizenship and does not indicate that she took money.
> The petitioner also contends that Detective McRae lied. A review of the transcript, as well as the petitioner's exhibits, does not even suggest that he committed perjury.
> In *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), the Supreme Court held that where a prosecutor allows a state witness to

give false testimony without correction, the conviction must be reversed if the witness's testimony reasonably could have affected the jury's verdict, even if the testimony goes only to the credibility of the witness. In order to demonstrate a claim under *Napue*, a defendant must prove that the prosecutor colluded with the witness to provide false testimony.

The petitioner has failed to establish any portion of a *Napue* violation. Relief will be denied on this claim.[104]

The Louisiana Fifth Circuit concluded:

Upon our review of the writ application and attachments thereto, we find that relator has failed to meet his burden to prove a *Napue* claim. First, based upon the documentation submitted in connection with the writ application, we cannot find that the trial court erred in its determination that the testimony cited by relator is taken out of context and does not conclusively show that Ms. Lather's provided false testimony. Second, given the evidence presented against relator at trial, including a positive identification by an independent witness of relator as a suspect in the murder, we find that the trial court did not err in determining that relator failed to meet his burden to prove that the challenged testimony was actually false and that relator's "conviction was gained as a result of that perjured testimony." *Broadway*, 753 So.2d at 814. This argument is without merit.[105]

The Louisiana Supreme Court denied petitioner's related writ application without assigning reasons.[106]

A claim of prosecutorial misconduct, including the use of false testimony, presents a mixed question of law and fact. Eaglin v. Louisiana, No. 19-9659, 2020 WL 475770, at *28 (E.D. La. Jan. 7, 2020), adopted, 2020 WL 474923 (E.D. La. Jan. 29, 2020), certificate of appealability denied, 2020 WL 4592908 (5th Cir. Aug. 6, 2020); Harvey v. Cain, Civ. Action No. 13-2994, 2013 WL 6490484, at *5 (E.D. La. Dec. 10, 2013). Therefore, to obtain federal relief, petitioner must show that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

---

[104] State Rec., Vol. 3 of 8, Order dated October 5, 2017, p. 3.
[105] Preston, 2018 WL 3720068, at *5; State Rec., Vol. 3 of 8.
[106] Preston, 280 So.3d at 168; Rec. Doc. 3-5, p. 43.

of the United States." 28 U.S.C. § 2254(d)(1).  For the following reasons, the Court finds that he has not made that showing.

Due process may be violated if a prosecutor knowingly presents false testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).  However, in order to prevail on such a claim, a petitioner "must show 1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." Canales v. Stephens, 765 F.3d 551, 573 (5th Cir. 2014) (quotation marks omitted); accord Devoe v. Davis, 717 F. App'x 419, 426 (5th Cir. 2018).  Evidence is 'false' if, inter alia, it is specific misleading evidence important to the prosecution's case in chief.  False evidence is 'material' only if there is any reasonable likelihood that it could have affected the jury's verdict."  Id.

Petitioner is correct that Danielle Lathers testified on cross-examination that she was in the lobby while Detective McRae interviewed her minor son, and, as a result did not hear their conversation[107].  She also testified that she, her daughter, and petitioner were at Wagner's Meat Market located between Airline and Williams streets when they saw a wanted poster with photographs of a person whom they recognized as petitioner based on the clothing.[108]

Defense counsel elicited on the cross-examination of Detective McRae that Danielle Lathers sat right next to her son, Keenan Lathers, when McRae interviewed him.[109]  Keenan Lathers did not testify at trial, however; McRae testified that the minor told McRae that petitioner admitted to him that he had killed a man on Roosevelt Street after the man told petitioner that he did not have any money.[110]  Detective McRae testified that he also interviewed Kayla Lathers, petitioner's

---

[107] State Rec., Vol. 6 of 8, trial transcript of June 25, 2014, pp. 97-98.
[108] Id., pp. 82-85, 95.
[109] State Rec., Vol. 7 of 8, trial transcript (con't) of June 25, 2014, p. 169.
[110] Id., pp. 171, 173.

girlfriend, who did not testify at trial, and that she told McRae they saw the wanted poster at Brother's.[111]

Perjury is the offering of "false testimony concerning a material matter with the *willful intent* to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993) (emphasis added). Petitioner has not shown that Danielle Lathers intentionally testified falsely regarding not being present when her son was interviewed or about the location of the wanted poster. McRae took statements from the Lathers on February 7, 2012, more than two years prior to the trial in this case.[112] Further, Danielle Lathers' presence during her son's interview and the location of the wanted poster, which was posted in various places in the community,[113] were not material matters.

Additionally, contradictory testimony from witnesses or inconsistencies in a witness's testimony at trial are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjured. Koch v. Puckett, 907 F.2d 524, 531 (5th Cir. 1990); Webster v. McCoy, No. 9:030cv-00440, 2007 WL 2292994, at *5 (N.D.N.Y. Aug. 6, 2007) ("Inconsistencies, to the extent they may have existed, between the statements of certain witness contained in the police reports and the trial testimony goes to credibility, but does not necessarily make the testimony false or that the prosecution knew it was false." (footnotes omitted)).

---

[111] Id., p. 172.
[112] Id., p. 169; State Rec., Vol. 2 of 8, interview transcripts of Danielle Lathers, Kennan Lathers, and Kala Lathers dated February 7, 2012. .
[113] State Rec., Vol. 7 of 8, trial transcript (con't) of June 25, 2014, p. 152; State Rec., Vol. 6 of 8, trial transcript of June 25, 2014, p. 17; State Rec., Vol. 2 of 8, Kenner Police Department Incident Report dated May 30, 2012, p. 23 (indicating that "hundreds" of flyers were distributed "throughout the neighborhoods north and south of Airline Drive, plus the businesses along the Airline Drive corridor from Roosevelt Boulevard to Williams Boulevard.").

Lathers also testified that she did not receive any reward for the information she gave police about petitioner committing the murder.[114]  During her interview with Detective McRae, Danielle Lathers explained that she came forward

> [b]ecause it's it's like this.  If I, if I lose a loved on in my family and you know and nobody don't know who did or whatever like this.  It's like the police don't know, they got a sketch, but they don't know.  They can't point the finger.  And somebody know their information ok.  I want y'all to help my family like I'm helping your family.  It's not about the money or nothing like that.  Because one minute you have money and the next minute it's going.  It's about helping people.  We need to stick together.  We really do.[115]

There is absolutely no evidence from this statement or any testimony or other evidence that Lathers received a reward for the information.  To the contrary, at sentencing, the prosecution confirmed that Crimestoppers verified that no one who called in a tip received any type of reward.[116]  Finally, petitioner points to two other crimes to which Lathers was a witness.[117]  In an arson case, Lathers served as a witness for the prosecution, and testified that she witnessed an altercation between the defendant and a neighbor and later saw the defendant walk to a trailer carrying something in his hand, and a few minutes later saw smoke coming from the trailer.[118]  In a second case, Lathers served as an alibi witness for a close friend charged with murder and testified that he was with her at the time of the shooting.[119]  However, she acknowledged a phone conversation with the defendant during which they discussed what she would tell police.[120]  The jury made a credibility determination to believe eyewitnesses to the murder over Lathers.[121]  Neither instance, however,

---

[114] State Rec., Vol. 6 of 8, trial transcript of June 25, 2014, p. 88.
[115] State Rec., Vol. 2 of 8, interview transcript of Danielle Lathers dated February 7, 2012, p. 7-8.
[116] State Rec., Vol. 7 of 8, sentencing transcript of July 10, 2014, pp. 7-8.
[117] Rec. Doc. 3-1, pp. 26-27.
[118] State v. Bruce, 102 So. 3d 1029, 1042 (La. App. 5th Cir. 2012)
[119] State v. Martin, 177 So. 3d 790, 795, 798 (La. App. 5th Cir. 2015).
[120] Id., at 795.
[121] Id., at 798.

shows that Lathers purposely testified falsely in *this* case. Likewise, petitioner has failed to prove that the prosecution directed or procured Lathers' allegedly perjured testimony.

As for Detective McRae, petitioner's argument is difficult to ascertain, but he appears to contend that McRae falsely testified regarding when petitioner became an actual suspect in the murder of Silva. Petitioner complains that he was not brought in for questioning despite multiple anonymous tips from August 2011 until January 19, 2012, that he was the murderer.[122]

Detective McRae testified that, after the murder, a Crimestoppers bulletin was compiled with still pictures from video surveillance and a composite drawing of the suspect, and was disseminated to the public.[123] McRae received an anonymous tip that a "Preston" who had recently been released from jail in Texas had committed the crime.[124] He explained that days later he received a Crimestoppers tip that "Joshua Preston" shot the victim.[125] He received other Crimestoppers tips naming petitioner as the perpetrator.[126] Based on those tips, he presented a photographic lineup to Conant, but she was unable to identify anyone.[127] In January, 2012, McRae received a phone call from a confidential informant who said that petitioner told her he shot the victim on Roosevelt.[128] The informant agree to give a statement but it took "a while" for her to go to the police department to give the statement.[129] McRae then learned of the armed robbery and secured search warrants.[130] It was not until after the search warrants were executed that Danielle

---

[122] Rec. Doc. 3-1, pp. 28-31; Rec. Doc. 21, pp. 28-32.
[123] State Rec., Vol. 7 of 8, trial transcript (con't) of June 25, 2014, p. 151-52.
[124] State Rec., Vol. 7 of 8, trial transcript (con't) of June 25, 2014, p. 142.
[125] Id., pp. 142-43.
[126] Id., p. 152.
[127] Id., p. 143-44.
[128] Id., pp. 152-153.
[129] Id., p. 153.
[130] Id.

Lathers told McRae she was the confidential informant, and, thereafter, she gave a statement and identified petitioner.[131]  Thereafter, Conant identified petitioner from a physical lineup.[132]

Although he contends that Detective McRae committed perjury at trial, petitioner has never produced any evidence establishing that McRae's testimony regarding when petitioner became an actual suspect in the murder of Silva was actually false, much less produced any evidence showing that the prosecutor knew it was false.  Therefore, his claim necessarily fails.  See, e.g., Cook v. Terrell, Civ. Action Nos. 07-8675 and 07-9226, 2008 WL 906307, at *7 (E.D. La. Mar. 31, 2008).

Based on the record, the Court cannot conclude that any of the state's witnesses testified falsely.  Likewise, petitioner has failed to prove that the prosecution directed or procured the alleged false testimony.  For these reasons, petitioner has not shown that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Therefore, relief is not warranted.

### E.    Ineffective Assistance of Counsel

Petitioner finally claims that he received ineffective assistance of counsel.  Specifically, petitioner claims that his counsel failed to pursue his alibi defense regarding the murder of Silva. He contends that his counsel failed to call Flazio Azevedo, Silva's roommate, to testify at trial.  He further claims that his counsel failed to investigate and present video surveillance footage from February 1, 2012, that showed a black male exit a bus and later showed a male in dark clothing disappearing down the 700 block of Filmore Street.  He finally claims his counsel was ineffective

---

[131] Id., pp. 159-60.
[132] Id., pp. 160-62.

in failing to investigate a material witness, Brandon Watson, who would have testified that petitioner was with him the night of the robbery.[133]

The United States Supreme Court has established a two-prong test for evaluating such claims. Specifically, a petitioner seeking relief on such a claim is required to show *both* that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984). The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must consider the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel

---

[133] The state argues that the claim relating to Brandon Watson is procedurally barred because petitioner failed to return to the Louisiana Fifth Circuit after the state district court denied the claim on remand. Rec. Doc. 17, pp. 10-12. It also appears that the claim may be unexhausted for that reason. Nonetheless, a federal habeas court may pretermit a ruling on whether a claim is procedurally barred when, as here, the claim clearly fails on the merits. See Glover v. Hargett, 56 F.3d 682, 684 (5th Cir. 1995); Wiley v. Puckett, 969 F.2d 86, 104 (5th Cir. 1992); Corzo v. Murphy, Civ. Action No. 07-7409, 2008 WL 3347394, at *1 n.5 (E.D. La. July 30, 2008).

falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

In the instant case, petitioner asserted his ineffective assistance of counsel claims on collateral review, and the state courts denied those claims on the merits.  The state district court in denying his claim of ineffective assistance to pursue his alibi defense, explained:

> In this claim the petitioner contends that his sister and cousin would have testified that he was in Houston from May to August of 2011.  The possibility of their testimony was known prior to trial, with defense counsel filing a Notice of Alibi and an Amended Notice of Alibi.  The state filed a response, indicating ten witnesses to be called to rebut the defense claims.
> In this collateral attack on his conviction, the petitioner fails to provide any actual support for his contention.  He does not attach an affidavit from his two relatives that they would have testified and that they would have given the version of events the petitioner now describes.  He does not attach an affidavit from his former counsel that the attendance of these witnesses could not be obtained at trial.
> The petitioner fails to meet either prong of the Strickland standard.  The court finds that he has not met his burden of proof under LSA-C.Cr.P. art. 930.2 and relief is denied on this claim.[134]

Regarding his claim of ineffective assistance of counsel for failure to present the testimony of Flavio Azevedo , the state district court held:

---

[134] State Rec., Vol. 3 of 8, Order dated October 5, 2017, p. 2.

In this claim, the petitioner contends that his attorney failed to present the testimony of the murder victim's roommate, Flavio Azevedo, to the effect that the victim called requesting held and that a description of a car was given. The petitioner suggests that this could have been a lead that might have shown that someone else could have been responsible for the shooting.

This claim is insufficient, as well as unproven. As with the other allegations of potential testimony, no affidavit is attached to suggest the existence of such testimony. The claim contains only unclear speculation from the petitioner himself.

The petitioner fails to meet either prong of the *Strickland* standard. The court finds that he has not met his burden of proof under LSA-C.Cr.P. art. 903.2 and relief is denied on this claim.[135]

With regard to his claim that his counsel was ineffective for failing to investigate and present evidence of video footage that was relative to the armed robbery, the state district court found:

This claim, that counsel was ineffective for failing to obtain video footage of the armed robbery, is deeply flawed. The record itself contains a description of the video in question, noting that the footage shows a man in dark clothing and that no identification can be made. The state also points out that the evidence from witness' testimony overwhelmingly establishes the petitioner's guilt in the armed robbery of Tiffany Hays French.

After review, the court finds that the petitioner has not met his burden of proof under LSA-C.Cr.P. art. 930.2. He fails to meet either prong of the *Strickland* standard and relief is denied on this claim.[136]

The Louisiana Fifth Circuit found that the state district court did not err in holding that petitioner failed to meet his burden with respect to these claims.[137] However, the appellate court found that the state district court failed to rule on petitioner's claim relating to the failure to investigate Brandon Watson and remanded the matter for a ruling on that issue.[138]

On remand, the state district court held:

The court will turn as directed to the specific claim at issue, namely, that trial counsel was ineffective by failing to investigate evidence of a material witness, Brandon Watson. The letter, sent to "Court House" on September 30, 2013, is attached as Exhibit K to the petitioner's PCR application. In its entirety it reads as follows:

---

[135] Id., p. 3.
[136] Id., p. 4.
[137] Preston, 2018 So. 3d 3720068, at *2-5; State Rec. Vol. 3 of 8.
[138] Id., at *5; State Rec. Vol. 3 of 8.

To Whom it may concern.  Information about "Joshua Preston's" case

I was questioned back in January 2012 about a armed robbery case involving Joshua Preston.  During that interview I held back information that can help solve the case.  Now I'm ready to talk and move on with my life.  I'm at the New Orleans Re-Entry Program.

Brandon Watson

The petitioner bases his PCR claim on a conclusion that Brandon Watson stated that Joshua Preston had nothing to do with the robbery.  However, the letter makes no such claim.  The letter fails to mention that murder at all.  Moreover, there is no indication whatsoever in this unsworn document that someone other than the petitioner committed the robbery and the murder.  This letter, even if believed, does not contain exculpatory or impeaching evidence.

Furthermore, the petitioner does not prove that his attorney did not follow up with Brandon Watson.  Police reports in the record establish that counsel knew of the existence of Brandon Watson and his presence on the scene.

The petitioner's own Exhibit B reveals major credibility issues with Brandon Watson.  As the police report details:

… during the execution of the search warrant at 728 Filmore Street, Brandon Watson, black male, 05-03-1992, was observed to be asleep on a mattress in one of the bedrooms.  Upon detaining Brandon, a Springfield XD .40 Caliber pistol was located underneath his pillow.  After a records check of the weapon, it was found to be reported stolen out of New Orleans.  Watson was arrested for the crimes of "Illegal possession of a schedule II C.D.S. (crack cocaine)," "Possession of a firearm while in possession of a C.D.S.," and "Illegal possession of a stolen firearm."

Counsel had a duty to make strategic decisions on what witnesses to call at trial.  The credibility of a man found asleep over a .40 caliber pistol, with warrants out for various gun and weapon charges, who initially gave, according to him, less than a full account when questioned by police on a serious crime, is very low indeed.  The choice not to call a non-credible witness does not suggest ineffective assistance, but rather an informed choice.

In its earlier order on this PCR, the court noted the established case law setting forth the burden of proof in effective assistance of counsel claims.  Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *State v. Washington*, 491 So.2d 1337 (La. 1986), a conviction must be reversed if the petitioner proves (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect.

A post-conviction petitioner must prove deficient performance to the point that counsel is not functioning as counsel within the meaning of the Sixth Amendment.

A petitioner must also prove actual prejudice such that the results of the trial cannot be trusted. It is essential that both prongs of the *Strickland* test must be established before relief will be granted. There is a strong presumption that counsel's performance is within the wide range of effective representation.

On the allegations that we are related to an attorney's trial strategy, the Supreme Court of Louisiana has noted that:

> Further, failure of trial counsel to adequately question alibi witnesses, properly investigate the case, make an opening statement, have defendant take the stand, request particular special charges, and object to certain questions asked of witnesses at trial are all claimed to clearly show that defendant was not adequately and effectively represented at the trial. We do not agree. *These charges are either leveled at decisions made by counsel during the heat of trial, the correctness of which cannot be determine by hindsight, or the validity of which is not evident from the record.*
>
> *State v. Stahan*, 325 So.2d 231 (La. 12/8/1975), emphasis added.
>
> The petitioner fails to prove either prong of the *Strickland* standard. At trial, defense counsel provided a meaningful defense. Counsel raised objections, cross-examined witnesses, and made spirited arguments on behalf of the client. On direct appeal, the Fifth Circuit noted the overwhelming evidence against the petitioner for all crimes charged. The petitioner was convicted due to the heavy weight of the evidence, not deficiencies of his trial attorney.
>
> Under the clear language of LSA-C.Cr.P. art. 930.2, the petitioner in an application for post-conviction relief has both the burden or proving that relief should be granted. Under the clear language of case law, both prongs of the *Strickland* standard must be established before relief will be granted on claims of ineffective assistance of counsel. On this claim of failing to investigate, the petitioner has not met his heavy burden of proof. He cannot show prejudice from his attorney's performance. The record overwhelmingly reveals that the petitioner had the competent assistance of counsel in a fair trial with reliable results. The court will deny post-conviction relief.[139]

The Louisiana Supreme Court denied petitioner's related writ application without assigning reasons.[140]

Because petitioner's ineffective assistance of counsel claims were denied on the merits, and because such claims present mixed questions of law and fact, petitioner is entitled to federal habeas

---

[139] State Rec., Vol. 3 of 8, Order dated June 27, 2018, pp. 1-2.
[140] <u>Preston</u>, 280 So. 3d at 168; Rec. Doc. 3-5, p. 43.

relief on the claims only if he shows that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of ineffective assistance of counsel claims is in *fact doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's

assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (emphasis added; citations omitted). Therefore, on habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to any aspect of petitioner's ineffective assistance of counsel claims.

First, petitioner makes several claims regarding his counsel's alleged failure to investigate the case. When a petitioner is claiming inadequate investigation, he must present "actual evidence as to what investigative steps counsel took or failed to take. Without such evidence, he cannot show that counsel performed deficiently." <u>Eaglin</u>, 2020 WL 475770, at *24. Here, petitioner has presented no evidence as to what steps counsel took or failed to take in investigating the case. Second, even when a petitioner makes that preliminary showing, he must then additionally "prove that prejudice resulted from the inadequate investigation. To make that showing, he must point to evidence in the record demonstrating that further investigation would in fact have revealed additional information beneficial to the defense." <u>Id.</u> at *25.

Petitioner points to video surveillance from the night of February 1, 2012. He speculates that the footage would have contradicted French's testimony regarding the description of the perpetrator who robbed her.

The police report related to the incident indicates that Detective Schouest met with Anthony Loiacono on February 2, 2012, to review his video surveillance from the prior evening.[141] Schouest described the footage depicting the following:

> a black male exiting a Jefferson Transit Authority Bus at the corner of Airline Drive and Roosevelt Boulevard. The male then walked east bound on 10th Street out of view of the camera. Minutes later the camera depicted an image of a male clad in dark clothing running for the north side of Airline Drive, disappearing into the 700 block of Filmore Street. No identification could be made from the footage. Mr. Loiacono copied the footage to a cd and handed the cd to me. The cd rom was filed as evidence under this item.[142]

Petitioner has simply not shown his counsel was ineffective for not presenting the video footage or any resulting prejudice. Detective Schouest very clearly stated that no identification could be made from the video. Further, there was overwhelming evidence of petitioner's guilt of the armed robbery of French. He is not entitled to relief as to this claim.

Petitioner also contends that his counsel was ineffective for abandoning his alibi defense that he was in Houston, Texas with his sister when Silva's murder occurred. He contends that his sister Clarinica Preston and cousin Myron Preston would have testified he was in Texas from the time he was released from prison on May 19, 2011, until Myron Preston drove him to Kenner, Louisiana in August 2011. He further claims that his counsel should have presented the testimony of Azevedo, Silva's roommate. Finally, he claims that Brandon Watson had knowledge that petitioner did not commit the armed robbery on February 1, 2012, and that his counsel failed to contact him.

---

[141] State Rec., Vol. 1 of 8, Kenner Police Department Report dated March 12, 2012, p. 6.
[142] Id.

First, defense counsel filed a Notice of Alibi on February 28, 2014, alleging that on the date of Silva's murder, petitioner was at the home of his sister, Clarinica Preston, and that he did not move to Louisiana until August 2012, when he was driven by his cousin Myron Preston.[143] Defense counsel corrected the year from 2012 to 2011 in an Amended Notice of Alibi filed on June 12, 2014.[144] The state filed a response indicating that it intended to call ten named witnesses to refute petitioner's alibi.[145] Ultimately, defense counsel did not call either Clarinica or Myron Preston to testify at trial.

According to the police report related to the murder, Azevedo walked up to Officer Louis when the EMS were on scene and identified himself as Silva's roommate.[146] Officer Rappold interviewed Flavio Azevedo, Silva's roommate, at the hospital.[147] Azevedo told Rappold that Silva contacted him via cellular phone seeking help.[148] Azevedo also told Rappold that sometime after he arrived at the scene of the shooting of Silva, he observed an older model Chrysler sedan travel south on Roosevelt Boulevard, drive past 10th Street, back up and turn west on 10th Street.[149] He provided the officer with the last three digits of the license plate of the vehicle.[150]

The Fifth Circuit has held:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, *we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.* This requirement applies to both uncalled lay and expert witnesses.

---

[143] State Rec., Vol. 1 of 8, Notice of Alibi dated February 28, 2014.
[144] State Rec., Vol. 2 of 8, Amended Notice of Alibi dated June 12, 2014.
[145] State Rec., Vol. 2 of 8, State's Response to Defense's Notice of Alibi dated June 20, 2014.
[146] State Rec., Vol. 1 of 8, Kenner Police Department Report dated May 30, 2012, p. 20.
[147] Id.
[148] Id.
[149] Id.
[150] Id.; State Rec., Vol. 2 of 8, Narrative, dated July 29, 2011, p. 5.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (emphasis added; citations, quotation marks, and brackets omitted); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."). The Fifth Circuit has further cautioned that "the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.' " Hooks v. Thaler, 394 F. App'x 79, 83 (5th Cir. 2010) (quoting Woodfox, 609 F.3d at 808).

Petitioner has presented no evidence, such as affidavits from either his sister, his cousin, or Azevedo demonstrating that they were available to testify at the trial and would in fact have testified in a manner beneficial to the defense. Therefore, he obviously failed to meet his burden of proof with respect to this claim. See, e.g., Cox v. Stephens, 602 Fed. App'x 141, 146 (5th Cir. 2015) (rejecting claim that counsel was ineffective for failing to call witnesses at trial, noting, "Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and Nos. 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director,

TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.")  Furthermore, there is no evidence that the car Azevedo saw sometime after he arrived at the scene of the murder was in any way connected to Silva's murder.  The video evidence, rather, showed that the perpetrator followed Silva on foot and fled from the scene on foot.

As for defense counsel's failure to call Brandon Watson to testify at trial, "[c]ourts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and scrutiny of counsel's performance must be highly deferential." Rose v. Flores-Ortega, 528 U.S. 470, 120 S. Ct. 1029, 1034-35, 145 L. Ed. 2d 985 (2000).  For many reasons, counsel's decision not to call Watson at trial was not unreasonable.

The police report related to the armed robbery indicates that Brandon Watson was located in the second bedroom on February 1, 2012, when the police searched the home pursuant to Smith's consent and that Watson was interviewed, although his interview is not included in the record.[151]  Two police reports indicate that during the search of a search warrant at 728 Filmore Street on February 3, 2012, Brandon Watson was found asleep in one of the beds.[152]  A firearm was located underneath his pillow.[153]  Watson was arrested and charged with drug and firearm offenses.[154]

Petitioner submitted a copy of a letter from Brandon Watson mailed to the "Court House" at 200 Derbigny Street on September 30, 2013.[155]  According to the letter, Watson states that he

---

[151] State Rec. Vol., 1 of 8, Kenner Police Department Report dated March 12, 2012, p. 1, 3 .
[152] Id., p. 7; State Rec., Vol. 2 of 8, Kenner Police Department Report dated May 30, 2012, p. 29.
[153] Id.; State Rec., Vol. 2 of 8, Kenner Police Department Report dated May 30, 2012, p. 29.
[154] State Rec., Vol. 2 of 8, Kenner Police Department Report dated May 30, 2012, p. 30.
[155] State Rec., Vol. 3 of 8, Letter from Brandon Watson postmarked September 30, 2013.

was "questioned back in January 2012 about a[n] armed robbery case involving Joshua Preston. During that interview I held back information that can help solve the case. Now I'm ready to talk and move on with my life. I'm at the New Orleans Re-entry Program."[156] The Docket Master does not reflect that the letter was ever docketed.[157] Nor is there any evidence, other than petitioner's self-serving claim, that defense counsel was aware of Watson's letter.

Regardless, Watson's unsworn letter does not exonerate petitioner from any crime. He does not mention <u>any</u> specific information about the robbery nor how he learned of any information. His letter merely states that he was not completely truthful when he was interviewed by police. His own admission that he withheld information from the police, along with the fact that he was charged with drug and firearm offenses, do not paint him as a particularly credible witness. Defense counsel simply was not ineffective in failing to call Watson to testify at trial.

Petitioner also submitted a sworn affidavit from Watson dated July 12, 2018, notably *after* the state district court issued its order on this issue.[158] Watson states:

> On February 1, 2012, Joshua Preston and I were together at a mutual friend's home located at 728 Filmore St., in Kenner, Louisiana. Around 11:00 a.m. that day, Joshua came over to this location and was in my company until 8:00 p.m. Later that same evening, while there his sister called to ask for one hundred dollars and requested that he meet her on Taylor St. I knowledge that particular conversation because we were in the same room on 728 Filmore St., in which the phone was on speaker mode. After ending the call with his sister, I accompanied Joshua to the front door, he (Joshua) informed me that he will shortly after meeting his sister to give her the money she requested. Unfortunately, Joshua was accused of committing an armed robbery of some lady who was going to church. According to the Kenner Police Department, this happened sometime before or around 7:30 p.m. that same night.. That being the case, I can duly attest that I know Joshua did not commit the crime he was accused, arrested and convicted of because as I state earlier, he was in my company until 8:00 p.m. While I was incarcerated and assigned to the Correction Court Re-Entry Program at the Orleans Parish Prison, I wrote a letter to the Jefferson County Courthouse, to make an impassioned plea

---

[156] <u>Id.</u>
[157] State Rec., Vol. 2 of 8, Docket Master (undated).
[158] Rec. Doc. 3-5, p. 41-42. Petitioner included the affidavit, which he claimed was "newly discovered exculpatory evidence" as an exhibit to his Motion for Leave to Stay Proceedings filed April 24, 2019. <u>Id.</u>, at pp. 38-42.

informing them that I was willing, ready and able (and still is), to give oral testimony in open court to help solve the case. To no avail, did anyone bother to respond to the letter in any shape, form or fashion. So again, I am now coming forward on my own accord, without any promises of reward, potential reduction in any other means to force a confession or the equivalent. I freely give this sworn testimony and affidavit willingly and truthfully, in the hopes of helping to absolve an innocent man from a crime he didn't commit. I am willing to offer same at a contradictory/evidentiary hearing should the court grant such.[159]

Even if that affidavit, executed, more than six years after the crime, is considered, petitioner's claim still fails. As a convicted felon, it is highly likely that the jury would have considered him an inherently suspect witness and would have possibly discounted his testimony on that basis alone. See Morales v. Johnson, 659 F.3d 588, 606 (7th Cir. 2011) ("[C]onvicted felons have diminished credibility."); cf. Coleman v. Diaz, No. CV 10-02343-VBF-RNB, 2014 WL 1795157, at *7 (C.D. Cal. Mar. 11, 2014) (citing cases explaining that a declarant's status as a convicted felon undermined his proffered testimony). Second, given that Watson and petitioner are friends, his affidavit is inherently suspect. See, e.g., Milton v. Secretary, Department of Corrections, 347 F. App'x 528, 531 (11th Cir. 2009) (finding the reliability of petitioner's affidavits suspect because they were executed by friends or fellow inmates). Finally, even if the jurors were willing to overlook Watson's criminal history and his friendship with petitioner, given the overwhelming evidence of petitioner's guilt of the armed robbery, petitioner has not shown a reasonable probability that the outcome of the trial would have been different if Watson had testified. He, therefore, has failed to show any prejudice as a result of his counsel's failure to call Watson to testify at trial. He is not entitled to relief as to this claim.

For all of the foregoing reasons, petitioner's ineffective assistance of counsel claims should be denied.

---

[159] Id.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Joshua Preston be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this fifth day of May, 2021.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**